## Ex Parte WHITE, In Re. JESUP, vs. THE WILMINGTON AND MANCHESTER RAILROAD COMPANY.

A railroad corporation being indebted to three classes of bondholders, secured by a first, second and third mortgage, made an arrangement with most of the bondholders under which a new bonded debt was to be created, secured by a new mortgage. A large majority of the bondholders, W, who held bonds secured by the second and third mortgages, being one of them, came in under this arrangement, and exchanged their old for the new bonds. The mortgaged premises were afterwards sold under a decree to foreclose the new mortgage, and the proceeds, after paying off the creditors under the first, second and third mortgages who had not come into the arrangement, were insufficient to satisfy the bonds of a class, which, by the terms of the new mortgage, had precedence over those of the class to which W's new bonds belonged, nor would the proceeds of the sale have been sufficient to satisfy the bonds secured by the first mortgage, if no exchanges had been made. W. then intervened by petition, and alleging that he had exchanged his old for new bonds under a separate agreement, that if all the old bond-holders did not come into the arrangement, his old bonds should be returned to him, and he be restored to all his rights thereunder, he prayed that his old bonds be returned, and that he be paid out of the proceeds of the sale as a creditor under the second and third mortgages : *Held,* That W , assuming his allegations to be true, had no equity to the relief he asked as against purchasers of the new bonds without notice of his equity.

BEFORE RUTLAND, J., AT MARION, OCTOBER TERM, 1870.

Before the mortgage to Jesup, hereinafter mentioned, was given, the Wilmington and Manchester Railroad Company executed three mortgages as follows :

No. 1. A mortgage to Edward Sandford, dated May 1, 1851, to secure bonds to the amount of $600,000.

No. 2. A mortgage to Edward Sandford, dated March 1, 1853, to secure bonds to the amount of $200,000.

No. 3. A mortgage to George W. Dargan, dated April 12, 1855, to secure bonds to the amount of $200,000.

For principal and interest on the above mentioned bonds, and a debt of about $88,000 secured by a pledge of stock, the company was indebted, on May 8, 1866, in the sum of $1,300,000 and upwards. For the purpose of retiring this indebtedness, with the consent of the creditors, which it hoped to obtain, and providing means to rebuild and equip its road, the company, on that day, executed a new mortgage to M. K. Jesup in the sum of $2,000,000, to secure bonds divided into three classes of preferences as follows :

First preference bonds, to the amount of $800,000, to be exchanged for the bonds and coupons outstanding, secured by mortgage No. 1.

Second preference bonds, to the amount of $650,000, to be used in rebuilding and equiping the road.

Third preference bonds, to the amount of $550,000, to be used in funding and retiring the bonds secured by mortgages Nos. 2 and 3, and the debt secured by a pledge of stock.

The terms of the new mortgage were agreed to by most of the creditors. Of the old bonds, all were exchanged except a few of the No. 1 bonds, amounting to about $34,000, and of the Nos. 2 and 3 bonds, amounting to about $30,000.

The Company having failed to pay interest on the bonds issued under the new mortgage, and thereupon the principal debt, by the terms of the mortgage, having become due and payable, on the 1st February, 1868, M. K. Jesup, the mortgagee, filed this bill against the company for foreclosure and sale of the mortgaged premises. The bill was afterwards amended, and B. F. Newcomer, who held outstanding bonds under mortgage No. 1, and a large amount of the first preference bonds under the new mortgage, of which he was the purchaser, and others, were made parties defendant.

Under a decree for foreclosure and sale, the mortgaged premises were sold by a Referee, on January 5, 1870, for $250,000. Of this sum about $64,000 were applied to the payment of the outstanding bonds, under mortgages Nos. 1, 2 and 3, leaving about $186,000 to be applied to the first preference bonds under the new mortgage.

A report of the sale, and of the payment of the outstanding bonds under the three older mortgages, was made and confirmed, and, at the same time, it was ordered that the Referee advertise for creditors having claims on the fund in Court, to come in and prove the same, within ninety days.

At this stage of the proceedings, and before the ninety days had expired, A. J. White, on May 7, 1870, filed his petition in the cause, wherein he stated that, in August, 1866, he was the owner of five bonds, each for $1,000, secured by mortgage No. 2, and ten bonds, each for $1,000, secured by mortgage No. 3; that, at the time mentioned, he exchanged these bonds, amounting, with interest, to $17,000, with J. W. Cameron, an agent of the company, for third preference bonds, under the new mortgage; that the exchange was made on the condition that all the old creditors should come into the new arrangement, and that it was expressly understood and agreed, between the petitioner and the agent, that, if any of the holders of the old bonds declined to exchange their bonds for new ones, whereby the scheme of retiring the old bonds and consoli-

dating the entire debt of the company, under the mortgage to Jesup, should be defeated, the old bonds of the petitioner should be returned, on his giving up the new ones. The prayer of the petitioner was, that he be allowed to intervene; that, on his depositing the new bonds, received from the agent, with the proper officer of the Court, his old bonds be returned to him, and that he be paid the amount due him out of the fund in Court.

It was referred to the Referee to take evidence under the petition and report the same, and he did so, reporting evidence which tended to establish the allegations of the petition; but there was no evidence that B. F. Newcomer, when he became the purchaser of the first preference bonds held by him under the new mortgage, had notice of the petitioner's equity.

On the petition coming up for final hearing on the report of the Referee, His Honor held that the claim for restoration of the old bonds was inadmissible as against the holders of the first preference bonds under the new mortgage, and he made a decree dismissing the petition.

The petitioner appealed, and now moved this Court to reverse the decree, on the grounds:

1. That the petitioner did not surrender his old bonds, so as to release the lien of the mortgages under which he held, as against the other bondholders.

2. That he only delivered his original bonds under certain conditions, which have not and cannot be fulfilled, and that, by the very terms of the arrangement which he made, he is entitled to have his original bonds, with their security unimpaired, returned to him.

*McIver*, for appellant:

White claims the redelivery of his bonds according to the contract with the agent of M. K. Jesup and of the Wilmington and Manchester Railroad Company.

This arrangement being within the scope of Cameron's agency, as appears by the testimony and terms of circular, his principals would be bound thereby, even though fraud or improper or unlawful conduct be imputed to the agent.

"A principal is liable for the conduct of his agent, even where he acts improperly and unlawfully, but within the scope of his agency." *Parkerson* vs. *Wightman*, 4 Strob., 366.

"A party is bound *civiliter* by the fraud of his agent; he will not

be permitted to retain advantages gained through that fraud."— *Johnson* vs. *S. W. Railroad Bank*, 3 Strob. Eq., 263.

Cameron was the agent of Jesup, and he the trustee of the bond-holders under his mortgage, of whom Newcomer, the rival claimant here, is one. Cameron was really the agent of Newcomer, and a contract made with Cameron is binding on Newcomer. Again, as to question of notice, we allege:

1st. That Newcomer had actual notice: 1. Because notice to the agent is notice to the principal, (Story on Bills, Sec. 305, p. 369, supported by *Smith* vs. *Thatcher*, 4 Barn. & Ald., 200,) and Cameron certainly had notice. 2. The terms of Newcomer's own petition to intervene shows notice. 3. The terms of the Jesup mortgage.

2d. If Newcomer did not have actual notice at the time of the purchase of the Jesup bonds, the terms of those bonds were sufficient to put him upon inquiry.—*Jones* vs. *Smith*, 1 Hare Rep., 43, cited in a note to 1 Story's Eq. Jur., §§ 399, 400.

The Jesup bonds, under which Newcomer claims, by their very terms disclosed the existence of the Jesup mortgage, and that referred, in express terms, to outstanding, unsatisfied mortgages. Was not this notice to Newcomer?

Again, Newcomer proved some of the bonds belonging to the very class in which White claims to stand. There is no evidence to show that Newcomer ever applied to the Railroad Company or to Jesup, the trustee, to ascertain whether all the old bonds had been surrendered.

The only evidence looking that way would tend to show that there was some collusion between Jesup and Newcomer.

If Newcomer had no notice of any kind, this would be no defense. 2 Redfield on Railways, 527, fourth edition, where the following language is used: "Where the debentures or mortgage securities of a railway company had been issued by the company to a party, under a contract, which amounted to a fraud upon the shareholders, and they were transferred by such party in the market to *bona fide* purchasers, it was held that such purchasers took the securities subject to all equities existing between the prior parties."

But suppose Newcomer should be able to put himself in the position of a *bona fide* purchaser without notice, he would then encounter the rule laid down in 2 Story Eq. Jur., § 1502, as follows: "Even the purchaser of an equity is bound to take notice of, and is bound by *a prior* equity; and, between equities, the established rule is that he who has the prior equity, in point of time, is entitled

Columbia, April, 1871.

to like priority in point of right."—*Willoughby* vs. *Willoughby*, 1 T. R., 763.

Here White certainly had the prior equity to Newcomer.

Another ground of resistance to the claim of White is that the same equity set up by him would set up *all* the other old mortgage bonds. To this we answer:

1st. The Court is hearing a case made before it, and not considering cases that may hereafter possibly arise.

2d. The time limited by the order for creditors to come in has long since passed, and no one but White has come in. Who has any right to say any other will come in? How is the Court to know that any other can make the proof made by White?

3d. Must White fail to obtain relief from a fraud, whereby he lost possession of his bonds, for fear some one else may come in and claim relief from a similar fraud?

Again, all, or at least nearly all, of the Jesup bonds of the first and second preference (and it is useless to speak of the third preference) have passed into the hands of a purchaser, who has proved them in this cause, and, by so doing, has put it beyond his power to assume our position. He was not a holder at the time of exchange, but a subsequent purchaser.

Newcomer cannot complain of fraud in the setting up of White's bonds, as he does in his answer, on the ground that it will defeat the payment of the convertible bonds, issued for the repair of the road, because it is conceded by his substitute, Walters, and shown by the Referee's report, that not a dollar of these convertible bonds will be paid in any event.

Newcomer has proved second Sandford mortgage bonds, (in which class White claims five bonds,) $12,306.90; and has also proved a judgment obtained on coupons of the Dargan mortgage bonds, to the amount of $2,310, for which he has been paid in full, while he says it would be a fraud to allow White to prove bonds of the same classes, and adds that, even if White were to be allowed to set up his original bonds, he would get nothing, because the proceeds of the sale of the road was not sufficient to reach either of these classes. If this position of Newcomer is entitled to any weight at all, it leads to the inevitable conclusion that Newcomer has got money which he ought not to have.

Newcomer claims, that after having been paid the full amount of the bonds held by him, of the same classes as those which White claims, that the balance in the hands of the Referees shall be paid

to him, in utter disregard of White's rights, as the real holder, in equity and good conscience, of the old bonds, and that, too, after Newcomer has, by his own petition, asked that protection may be given to the holders of the old bonds, and after he has been admitted as a party to this cause on that prayer and for that purpose. White was really brought into this cause by the petition of B. F. Newcomer, and by him were the old mortgages set up.

By the order of the 4th November, 1869, special provision was made for one occupying White's position, by declaring that, at the sale of the road, "the same rateable proportion of cash (as was allowed to be paid in bonds by the purchaser, if a bondholder,) should be paid in by him for the other bonds of the same grade of priority not in his hands," and then, by the order of 19th January, 1870, all the creditors of the company were called in to prove their demands, and, under this order, White comes and simply asks their delivery of his bonds, which were taken from him and are now held by the complainant Jesup, in utter disregard of the conditions upon which they were delivered, in order that he may prove them under said order.

Laches has been imputed to White.

The record shows the contrary; when the bill was filed in Charleston, he imported himself into that case, and rested on the order of injunction.

Finding that this order was evaded by proceedings in the Court at Marion, he asked to be allowed to intervene before the time limited for the creditors to come in had elapsed, in order that he might regain possession of his bonds, which were illegally withheld from him, for the purpose of proving the same under said order. The fact that White received interest on the Jesup bonds, and sold some of the scrip, is also relied on as a ground of resistance to his claim. The answer to this is, the company owed White a certain sum of money, on which the interest, was payable semi-annually. He had a right to receive this interest and to acknowledge the receipt thereof; whether he did this by a formal receipt to that effect, or by the surrender of certain papers, called coupons or scrip, can make no difference. It will be observed, also, that the company were still engaged in making the proposed exchange of bonds, when this interest was received and when the scrip was sold.

*Memminger*, for respondents:

Mr. White claims to rescind his surrender of the bonds formerly

held by him, and to have them restored and set up under the original mortgages No. 2 and No. 3.

Mr. Newcomer, in opposition, claims that he is purchaser for value of the bonds No. 1 and No. 2 of the Jesup mortgage without notice of any such equity as that now set up by Mr. White, and that, as Mr. White actually accepted and held for several years the bonds delivered him in exchange, under the Jesup mortgage, his claim to supersede Mr. Newcomer cannot be allowed.

. That if allowed, inasmuch as most of the bonds under the No. 1, oldest mortgage to Sanford, came in under the Jesup mortgage, Mr. White's bonds, under the Nos. 2 and 3 original mortgages would supersede the No. 1, and he would be in a better condition than he was originally; and that, as the road did not sell for enough to pay these No. 1 bonds, no damage is suffered by Mr. White by the surrender of his bonds.

There are two aspects in which the case naturally presents itself:

1. As between White and the Wilmington and Manchester Railroad Company.

2. As between White and the *bona fide* purchasers without notice, represented by Newcomer.

It might be that White could have a good claim against the Wilmington and Manchester Railroad Company, and none whatever against the purchaser. But it is clear that if he has no claim, which this Court will enforce, against the Wilmington and Manchester Railroad Company, he cannot possibly have any against Newcomer.

Let us consider the first:

I. Had White any claim against the Wilmington and Manchester Railroad Company?

He sets up an agreement made with their agent, Cameron, and his petition is a claim for its specific performance.

It is necessary, then, first to ascertain what this agreement is:

From the evidence, it would seem to be an agreement that if the Jesup mortgage arrangement could not be carried out, then White's bond should be returned, and he should be replaced in *statu quo*.

This would have been a perfectly fair agreement, but Mr. White now sets up a different one, and claims that his individual bonds shall stand on a different footing from all others, and that if there should only be a partial compliance with the Jesup mortgage, those who came in should be held to their surrender, and he should be

released from his, that is, that he should gain a precedence which he did not have before.

This, if true, would be a most unrighteous and fraudulent agreement, and is a mere afterthought, never intended by either party.

The intention was that the surrender should hold good, if a sufficient number of bondholders came in to make a substantial compliance. It would have been absurd to insist that all should come in; some would be dead, absent, covert, minors, etc.

White's own conduct proves that he considered the agreement, as then understood, to have been substantially complied with, otherwise he never would have presented again and again the coupons on the Jesup bonds and received payment of them; neither would he have accepted the scrip for the difference; neither would he have delayed making his claim until the commencement of this suit. These three facts, together with the implied acknowledgment of all the facts stated in the Jesup mortgage, by his acceptance of its bonds, are conclusive to show that the agreement merely looked to a substantial acceptance by most of the bondholders, and that that agreement was considered as having been executed. If, however, the agreement is the one now set up by White, then we submit that both the agreement in itself, and Mr. White's conduct in now setting it up, are such as will induce the Court to refuse any aid to its execution.

Batten on Spec. Perf., 256. To entitle a party to a decree there must be perfect good faith, and his conduct must be beyond reproach.

The granting relief is matter of discretion to be judged of in each case.—*City of London* vs. *Nash*, 1 Ves., Sen., 12.

And in the case of *Willard* vs. *Taylor*, 18 Wallace, 566, the Court show that it requires not only a fair agreement, but the fairest kind of dealing.—*Moore* vs. *Blake*, 1 Ball and Beatty, 69; and to the same effect are many other cases which might be cited.

Now, what kind of fairness would there be in such an agreement as that now set up by White, to wit: that he and Cameron, the agent of the Wilmington and Manchester Railroad Company, had a secret understanding by which to decoy the previous bondholders and new purchasers into an arrangement which would permit so undue an advantage ?

And then take White's subsequent conduct in holding back for so many years, making no claim, and actually receiving payment. No Court could aid in executing such a fraudulent agreement.

II. But how stands the case with the *bona fide* purchaser of the new bonds without notice? He reads the Jesup mortgage under which White has ostensibly come in; finds that he has surrendered his old bonds and released his lien. As against these parties, then, it is not only a proposal: 1. To rescind an executed agreement; but, 2. To set up a secret equity against purchasers, for value, of a negotiable security before due, and without notice.

1. Upon the point of rescinding, the Court requires a much stronger case for the plaintiff than for specific performance of an executory agreement. Here, as far as Newcomer is concerned, everything was executed. White's old bonds were surrendered and his lien gone.

The proposal now is to rescind the surrender and restore the lien.

In *Seymour* vs. *Delaney*, 3 Cowan, 518, Savage, C. J., says there is a wide difference between enforcing an executory contract and setting aside a contract deliberately executed, and the two subjects admit of very different views and considerations.

*Osgood* vs. *Franklin*, 2 Johns. Ch., 23. There is a very important distinction which runs through the cases, between ordering a contract to be rescinded and decreeing a specific performance.

And the Court will imply an agreement from the acts as well as the words of a party.

Mr. Sugden, Law of Vendors, 522, says: "If a person having a right to an estate permit or encourage a purchaser to buy it of another, the purchaser shall hold it against the person who has the right."

In *Nevin* vs. *Belknap*, 2 Johns. R., 573, it was held that a mortgagor allowing the mortgagee to sell the fee, and represent himself as absolute owner, cannot afterwards set up his equity of redemption, but is barred by his silence.

But when *bona fide* purchasers are concerned, the law is still more strict, and will not decree against them what it might have decreed between the original parties.

Thus, in *Hemphill* vs. *Stone*, 5 John's Ch., 193, defendant, after having entered into agreement with plaintiff for sale of a lot of land, sold the same to a third person for valuable consideration, without notice of the agreement, held that specific performance could not be decreed, and that plaintiff must seek his remedy at law for breach of the agreement.

So in *Waters* vs. *Travis*, on Appeal, 9 Johns., 450, specific per-

formance of a contract of sale will not be enforced to the prejudice of a *bona fide* purchaser for a valuable consideration, without notice of the previous contract of sale.

And in *Featherstonhaugh* vs. *Fenwick*, 17 Ves., 313, the Lord Ch. says: The interest which a third party may have against the specific performance of an agreement may preclude the execution of it, as even between the *cestui que trust* and trustee, as in a case where an insolvent tenant made over his lease to another, who treated for a renewal, under a secret agreement, in trust for the original tenant. Equity would not execute the agreement against the landlord, and even the principle that a trustee shall derive no benefit from his trust, shall fall, rather than such agreement be decreed to be performed against the landlord, though, except as to his interest, it would have been executed as between the other parties.

All these cases were only for specific performance of an executory agreement, in which the Court refused even to order performance. How much stronger would the case be, if the Court were asked to rescind an executed agreement, upon faith of which the purchaser had acted.

*Hadlock* vs. *Bulfinch*, 31 Maine, 246, cited with approbation by Hillard on Mortgages, 1 Vol., 334. If the mortgagee takes, for the amount due on the mortgage, the note of an assignee of the mortgagor, and gives up to the assignee the mortgagor's notes, this is not a mere renewal, but the substitution of a new security, and discharges the mortgage.

III. But a still more conclusive answer to White's case is that Newcomer's bonds are negotiable paper, purchased by him for value before due, and no previous agreement between the parties can affect their validity.

In Story on Prom. Notes, § 191, the law is thus stated : "The partial or total failure of consideration, or even fraud between the antecedent parties, will be no bar to the title of a *bona fide* holder of a note for a valuable consideration, at or before it becomes due, without notice of any infirmity therein."

Mr. Story on Bills, § 15, says it has become a general rule to hold bills of exchange (and, consequently, all negotiable paper) as in some sort sacred instruments in favor of *bona fide* holders for a valuable consideration without notice, and, § 188, he says: "Hence it is that a *bona fide* holder for value without notice is entitled to recover upon any negotiable instrument which he has received before it has become due, notwithstanding any defect or infirmity of the title of the

person from whom he derived it; as, for example, even though such person may have acquired it by fraud, or even by theft or robbery."

In *White* vs. *Vermont and Mass. R. R. Co.*, 21 Howard, 575, it is decided for the whole United States that coupon bonds, issued by railroad companies, are negotiable securities. And this decision has been approved by various decisions up to the case of *Gelpeke* vs. *City of Dubuque*, 1 Wall., 176.

And in the case of *Commissioners Knox County* vs. *Aspinwall*, 21 Howard, 539, it was held that the particulars set forth in the bond was all that the purchaser need look to, and if they imported a compliance with any conditions required by law, the purchaser need look no further.

Now, the Jesup bonds and mortgages expressly declared that the several preferences were fixed as therein set forth, and White accepted his bonds under the third preference, and Newcomer purchased under the first and second. No change, then, can now be made.

IV. But there is still a further difficulty in White's way. He has waived all claim, if he ever had one:

1. By delay in asserting it.

2. By accepting payment of his coupons on new bonds.

3. By accepting new scrip for difference between old and new bonds.

1. Delay in asserting a claim to set aside or have performed an agreement, is construed into acquiescence.

In *Lloyd* vs. *Collett*, 4 Bro. C. C., 469, a delay of seven months was held fatal.

In *Walker* vs. *Jeffreys*, 1 Hare, 348, V. C. Wigram holds the doctrine of delay being construed acquiescence as very useful, and affirms it.

In *Watson* vs. *Reid*, 1 Russ. & Milne, 236, one year's delay was held unreasonable.

Now Jesup's mortgage is dated 7th May, 1866, and this petition is filed 29th April, 1870.

2. But then the acceptance of payment of the coupons was express acquiescence.

Now, in 2 Hillard on Mortgages, 301, it is laid down that a mortgage may be extinguished by acts or declarations of the mortgagee, showing a waiver of his rights under it.

3. The acceptance of the new scrip is a still more definite acquiescence.

V. But, lastly, Mr. White has suffered no damage from the arrangement, and if restored to the *statu quo*, could get nothing.

If he is to be restored, every one else should be restored, and the proceeds applied accordingly; and from Referee's report, they cannot reach him. The proceeds of sale would not pay the original first mortgage bonds which were exchanged for the No. 1, under the Jesup mortgage, and which are still outstanding.

If the agreement made by the original bondholders with the Wilmington and Manchester Railroad Company could be set aside in favor of White, it would follow that it should be set aside in favor of all the bondholders. In that case, the original mortgages would be restored, and all the No. 1 Jesup preference bonds would rank first under the original No. 1 mortgage to Sanford. These, according to the Referee's report, would absorb much more than the proceeds of sale, and consequently there would be nothing left for Mr. White, or any subsequent mortgage bond.

To hold that White had a private understanding with the company, which would entice the previous liens to surrender their claims, and leave him to come in before them, would be such a breach of faith that no Court could sustain it. He also cited Story on Ag.; 148, 149 ; *Welsh vs. Parker*, 1 Hill, 155; *Bank vs. Johnson*, 3 Rich., 42; 1 Story Eq., §§ 378, 379.

Aug. 5, 1871. The opinion of the Court was delivered by

WILLARD, A. J. The appellant, A. J. White, seeks to reverse an order refusing the prayer of a petitioner, presented to the Circuit Court by way of intervention under a decree in the suit of M. K. Jesup *vs.* The Wilmington and Manchester Railroad Company and others, pending in that Court. The suit was for the foreclosure of a mortgage made by the company to M. K. Jesup, trustee. Prior to the filing of appellant's petition the property and franchises mortgaged had been sold under the order of the Court for the sum of $250,000, and a portion of the purchase money remained in Court for distribution. The petitioner set up a claim to part of this purchase money, but did not seek to disturb the decree of sale, nor the sale actually made thereunder.

In 1866, the company being indebted, and its property mortgaged to secure such indebtedness, under an arrangement with the principal part of its creditors, under which a new bonded debt, secured by mortgage to M. K. Jesup, trustee, was to be created and applied, in part, to discharge the then existing indebtedness of the company,

and, in part, to furnish the means of improving the practical condition of their road. A portion of the old indebtedness was held by the appellant, consisting of bonds—part of two several issues, having different priorities, that will be noticed hereafter. Appellant alleges that he parted with his securities to an agent of the company upon the agreement that, if the contemplated change of securities was not assented to by all the creditors, they should be returned to him ; that such change did not receive such assent, and that his securities have not been returned. It appears that White received, in exchange for such securities, bonds and scrip, under the Jesup mortgage. He now tenders a return of the last named securities, and demands the restitution of those originally held by him, in order that he may be let in to share the fund in Court, on the footing of a mortgage creditor holding under a. lien prior to that upon which the foreclosure and sale took place.

Assuming the fact to be as set forth by the appellant, yet he is not entitled to the relief demanded by his petition, unless it is made to appear that the existence of a state of facts such as he alleges will entitle him to a claim upon the fund in Court, or some portion thereof. This depends upon the question whether, in the event the appellant should succeed in establishing his right to the original securities held by him, he would be permitted to hold these securities as of their original priority, as against other original holders of securities of the same, or a still higher class who have also exchanged them under the Jesup mortgage. In other words, if all the original bondholders who have consented to the exchange are to be held to the strict legal consequences of such exchange, and the appellant's alone is to be permitted to stand on the rank due to the priority of lien originally enjoyed, then it is probable that he may establish a claim to a portion of the fund in Court; but if, on the other hand, the effect of establishing his petition will be to let in all the original bondholders according to their respective priorities as among themselves, then the whole fund will be absorbed before it can by possibility reach the demand of the appellant.

The original debt consisted of three classes of bonds, secured respectively by first, second and third mortgages. The appellant was originally a holder of bonds belonging to the second and third classes. The proceeds of the sale of the road do not equal the amount embraced in the first class. If, therefore, the original first mortgage bondholders are to be admitted on as good a footing as

appellant to the benefits of any decretal order that may result from his petition, the fund will be absorbed, and no part of it can, by possibility, reach him.

The appellant seeks the aid of equity. He does not occupy, as to the present question, the position of a judgment or mortgage creditor, having fixed legal right to a fund in the hands of a Court of Equity for distribution, and demanding it on the ground of such legal right. He brings into Court securities which, upon their face, cannot be paid out of the fund, but claims that certain extinguished securities should be set up in their place. He demands that, so far as he is concerned, the fund should be distributed on equitable principles.

The arrangement between the company and the several creditors, for the exchange of their securities, is regarded in equity as a single contract, for the reason that both the relations of all these creditors with the company and their relations with each other entered into its consideration. The equity of the contract is, therefore, commensurate with both of these classes of rights. If, then, the rights of the parties are to be constructed upon the equity of the contract, instead of upon its present legal form, it follows that the equities among creditors must be satisfied to make the remedy perfect.

If the appellant has a right to disturb the arrangement which has received the assent of the great majority of the original bondholders, there is an appropriate remedy; but as his only claim, recognizable here, is to participate in the distribution of the assets, it is an answer to his petition that the question of the right to the assets does not depend on the issue of fact raised by his allegations and the answer thereto. It is the distribution of the fund in Court, and not the settlement of general rights and equities between the parties, that is the only matter in hand in the present stage of this case.

It will be unnecessary to pass upon the other questions that have been raised, as the view taken is decisive of the whole case.

The appeal must be dismissed, and the order affirmed.

*Moses,* C. J., and *Wright,* A. J., concurred.